**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TROSHAWN McCOY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| CHICAGO POLICE OFFICERS JAMES CASSIDY (#2027), | ) | Magistrate: |
| KENNETH BOUDREAU (#20435), LUKE DALY (#21064), | ) | |
| FRANCIS VALADEZ (#21008), BERNARD RYAN | ) | JURY DEMAND |
| (#20867), JOHN BLOORE (#3081), J. FINE (#20213), | ) | |
| ADMINISTRATOR OF THE ESTATE OF | ) | |
| THOMAS COUGHLIN (#20983), THOMAS RICHARDSON | ) | |
| (#3385),    STEVEN DWAYNE DAVIS (#21075), | ) | |
| LARRY TUIDER (#1638), FRED BONKE (#2108), | ) | |
| CHERYL GREEN (#10738), UNIDENTIFIED EMPLOYEES | ) | |
| OF THE CITY OF CHICAGO, and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **COMPLAINT**

Plaintiff, TROSHAWN McCOY, by his undersigned attorneys, complains of Defendants,

Chicago Police Department Officers JAMES CASSIDY, KENNETH BOUDREAU, LUKE

DALY, DWAYNE DAVIS, FRANCIS VALADEZ, CHERYL GREEN, BERNARD RYAN,

JOHN BLOORE, J. FINE, the ESTATE of THOMAS COUHGLIN, the ADMINISTRATOR of

the ESTATE of THOMAS RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT

FRED BONKE, the CITY OF CHICAGO, and as-yet UKNOWN CITY OF CHICAGO

EMPLOYEES, as follows:

## INTRODUCTION

1.      In 1998, Troshawn McCoy was convicted of the execution style murders and armed robbery of Khaled Ibrahim and Yousef Ali, a brutal crime he did not commit. Taken from a classroom and arrested at the age of 17, he spent the next 21 years in custody before he was exonerated in 2017 and certified innocent by the Circuit Court of Cook County.

2.      Troshawn McCoy's conviction was no accident. Determined to close the murder cases, the Defendants coerced false and inculpatory statements from Troshawn McCoy and his co-defendants.  They also withheld exculpatory evidence from the trial prosecutor and from the defense that would have proven Plaintiff's innocence.

3.      As a result of the Defendants' misconduct, Troshawn McCoy was charged and wrongfully convicted, and sentenced concurrently to fifty-five years in prison for the murder and thirty years for the armed robbery.

4.      Nineteen years after they were convicted, the charges against Troshawn McCoy and his co-defendants were dropped when new fingerprint testing and other evidence confirmed that they were innocent of the murders and armed robbery.

5.      The misconduct that gave rise to Troshawn McCoy's wrongful prosecution and conviction was not an aberration. To the contrary, the Chicago Police Department (the "Department"), including officers working within the Department "Area" where this investigation occurred, engaged in a pattern of unlawfully coercing confessions over a period of years, frequently targeting young African-American men in order to close unsolved cases through overzealous and unlawful methods of interrogation.  Defendants James Cassidy and Kenneth Boudreau, in particular, have long track records of coercing false confessions and

fabricating evidence against those in their custody. The City of Chicago permitted these officers to act with impunity for years.

6.     Plaintiff Troshawn McCoy now files this civil rights action to bring the Defendants' misconduct to light, and to ensure that they are finally held accountable for their actions. Although Plaintiff has won back his freedom, he will never regain the lost years of his life in which he was incarcerated for a crime he did not commit. This lawsuit seeks redress for these grievous injuries.

## JURISDICTION AND VENUE

7.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

8.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred in this judicial district, the parties reside in this district, and Defendant City of Chicago is a municipal corporation located here.

## THE PARTIES

9.     Plaintiff Troshawn McCoy is 39 years old. At the time of the murders, he was a student at Dunbar High School and living with his mother at 8140 S. Chappel in Chicago, Illinois.

10.     At all relevant times, James Cassidy, Kenneth Boudreau, Bernard Ryan, John Bloore, Cheryl Green, Thomas Coughlin, Dwayne Davis, Luke Daly, J. Fine, Thomas Richardson, and Frances Valadez were officers with the Chicago Police Department, employed by Defendant City of Chicago, and acting within the scope of their employment. They are sued in their individual capacities. Defendant Coughlin is deceased and, accordingly, the

Administrator of his Estate is named as a party-defendant herein. These individuals are referred to collectively as "Defendant Officers."

11.     At all relevant times, Defendants Larry Tuider and Fred Bonke were sergeants with the Chicago Police Department, employed by Defendant City of Chicago, and acting within the scope of their employment. They are sued in their individual capacities.

12.     The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

## THE MURDERS OF KHALED IBRAHIM AND YOUSEF ALI

13.     At approximately 6:30 p.m. on December 4, 1995, two men perused cars at Elegant Auto, a used car lot on Chicago's South Side. While there, the men examined and touched two vehicles. They then went to Prestige Auto, a car lot next door, where they examined a third car.

14.     At around 7:00 p.m., the two men returned to Elegant Auto, entered an office at the back of the lot, and open fired on owners Khaled Ibrahim and Yousef Ali. The perpetrators killed Ibrahim and Ali execution-style, but left two other employees alive.

15.     The perpetrators then stole two cars from the lot and sped away from the scene. The stolen cars were not the same vehicles that the men had examined and touched earlier that evening.

16.     CPD forensic investigators arrived at the scene at around 7:30 p.m. that night. They lifted finger and palm prints from the two cars at Elegant Auto and the one car at Prestige Auto that the perpetrators had touched.

17.     At approximately 2:00 a.m. on December 5, 1995, CPD officers recovered the two stolen cars five miles away from the crime scene. They also recovered marketing stickers

that had been displayed on the cars and subsequently peeled off.  Fingerprints were lifted from both the cars and from the stickers.

18.     None of these recovered prints matched either Troshawn McCoy or any of his eventual co-defendants.

## DEFENDANT OFFICERS ARREST AND OBTAIN COERCED INCULPATORY STATEMENTS FROM TEENAGERS TROSHAWN MCCOY, LAROD STYLES, AND CHARLES JOHNSON

19.     On the afternoon of December 6, 1995, the day after the murders, Defendant Officers including Detectives Cassidy, Davis, and Daley began their coercive conduct when they entered Dunbar High School, took him from class and began questioning 17-year-old Troshawn McCoy. Without explaining why, they arrested him and took him to the Area One police station, located at 51st and Wentworth.

20.     Although the Defendants had no reason to believe that Mr. McCoy was involved in the murders, they harshly interrogated the teenager, isolated him, denied him the right to counsel, denied him the right to have a parent present, failed to provide him with a youth officer, fed him information about the murders and promised him he would go home without being charged for murder if he repeated their concocted confession.  The Defendants used such tactics to coerce him into adopting their falsified version of events.

21.     Even though he was innocent of the crimes, Troshawn McCoy eventually succumbed to the Defendants' coercion and manipulation and falsely implicated himself and three other teenagers—Larod Styles, Charles Johnson, and LaShawn Ezell—in the murders.  He gave a false and inculpatory statement to the Defendant Officers and former ASA Joseph Alesia.

22.     In his transcribed statement, Mr. McCoy parroted the Defendant Officers'
concocted scenario in which he and Mr. Ezell acted as lookouts for Charles Johnson and Larod
Styles, who planned to steal a car from Elegant Auto.  Mr. McCoy falsely stated that he and Mr.
Johnson watched Mr. Ezell and Mr. Styles enter the Elegant Auto office, heard gunshots seconds
later, and then saw Mr. Ezell and Mr. Styles run out and drive away in the two stolen cars from
the lot.

23.     The Defendant Officers, including Defendant Cassidy, knew that Mr. McCoy's
statement was coerced and false and merely a recitation of their fabrications.  Nevertheless, the
Defendant Officers used Mr. McCoy's coerced confession to arrest and interrogate Mr. Ezell,
Mr. Styles, and Mr. Johnson, all without probable cause.

24.     The Defendant Officers, including Detectives Davis and Valadez, arrested 15
year-old LaShawn Ezell at around 4:15 p.m. on December 5, 1995 and brought him to Area One
police headquarters.

25.     Using many of the same techniques that they used on Mr. McCoy, the Defendant
Officers interrogated Mr. Ezell for over six hours. These officers, including Defendant Coughlin,
obtained a false and involuntary inculpatory statement from the young teenager around 11:00
p.m. that night.

26.     During his interrogation, detectives alternatively threatened and encouraged him
to confess his involvement in the armed robbery and murders.  They falsely told him that he had
been implicated in these murders by witnesses.  They promised him that if he just confessed, he
would be able to go home.  Mr. Ezell repeatedly told the Defendant Officers who questioned him
that he was not involved in this crime and that Mr. McCoy was not his friend.  He told the
Defendant Officers what he had been doing that afternoon, which had nothing to do with armed

robbery and murder. Despite this, the Defendant Officers with the involvement of ASA Alesia wore down Mr. Ezell, repeatedly waking him up to interrogate him and coercing him into signing a false handwritten confession.

27.     At no point during the custodial interrogation or false confession did either the Defendant Officers or ASA Alesia inform Mr. Ezell that he had the right to have an attorney present or to remain silent.

28.     Mr. Ezell was interrogated outside the presence of a parent, guardian or an attorney, and during his interrogation was also questioned, at times, without a youth officer present. Although a youth officer was present for portions of Mr. Ezell's interrogation and false confession, she did nothing to intervene to prevent the false confession, or to protect Mr. Ezell's constitutional rights. Defendants repeatedly ignored Mr. Ezell's requests to see his grandmother, who was then his legal guardian. Defendants did not inform Mr. Ezell's family and/or legal guardian that he was in custody until sometime on, about, and/or after 11:00 p.m. on December 5, 2018, and did not allow Mr. Ezell himself to contact his family and/or guardian. In fact, Defendants actively prevented Mr. Ezell's grandmother from coming to the station by failing to inform her of Mr. Ezell's arrest and by later providing her false information about their conduct and intentions toward her grandson.

29.     As a result of the coercive and unconstitutional tactics used both by the Defendant Officers and ASA Alesia, at the end of the long interrogation, Mr. Ezell signed a false confession to a heinous crime that he did not commit.

30.     The Defendant Officers, including Detectives Bloore, Coughlin, and Fine, then arrested sixteen-year old Larod Styles at his home at around 5:00 p.m. on December 5, 1995.

31.     Despite having knowledge of Larod Styles's young age, the Defendant Officers interrogated him off and on for several hours outside the presence of a parent, guardian, attorney or other adult interested in his welfare.

32.     It was only after Mr. Styles had been interrogated multiple times that the Defendant Officers brought in a Youth Officer, Steven Terrell.  Officer Terrell, however, never actually spoke to Mr. Styles, did nothing to intervene to prevent the false confession, and did not protect Mr. Styles's interests or ensure that his rights were protected during the interrogation(s). Officer Terrell participated with other Defendants in obtaining a false inculpatory statement from Mr. Styles.

33.     Although the 16-year-old Mr. Styles, who was handcuffed to the wall of an interrogation room, adamantly denied any involvement in the murders, the Defendant Officers, including Defendant Bloore, obtained a false and involuntary inculpatory statement from Mr. Styled around 1:00 a.m. on December 6, 1995.

34.     Assistant Cook County State's Attorney Joseph Alesia, who was at the police station and actively working on this investigation with the Defendant Officers starting in the afternoon of December 5, 1995 and continuing into the early morning hours of December 6, 1995, participated and cooperated in the coercive interrogation, obtaining a false inculpatory statement from Mr. Styles, and the signing of the false, inculpatory statement.

35.     At around 5:30 p.m. on December 5, 1995, the Defendant Officers, including Detectives Bloore, Daly, and Davis, arrested Plaintiff Charles Johnson, then 19 years old, at his home.

36.     Mr. Johnson had just returned from a full day of work as a Coca-Cola Company delivery driver.

37.     The Defendant Officers handcuffed Mr. Johnson and refused to tell him why he was under arrest.

38.     As they transported Mr. Johnson to the Area One police headquarters, the Defendant Officers taunted him, calling him stupid, telling him to shut up, and offering to get him food but then refusing to stop for anything. When Mr. Johnson discovered that he had been arrested for murder, he immediately and consistently denied any involvement in the crime.

39.     Mr. Johnson was held in a small interrogation room where he was handcuffed to the wall. Over the course of several hours, the Defendant Officers, including Defendants Cassidy, Boudreau, and Valadez, subjected Mr. Johnson to a hostile and aggressive interrogation concerning the double murder. Throughout the interrogation, Charles Johnson proclaimed his innocence.

40.     Unsatisfied with Mr. Johnson's protestations of innocence, the Defendant Officers worked to overbear Mr. Johnson's will and force him to falsely implicate himself in the murders.

41.     The Defendant Officers gave Mr. Johnson information relating to the crime, including facts concerning the number of people in the car lot office, the color of the stolen getaway vehicles, and the location where the stolen vehicles were abandoned. These are the same facts that the Defendant Officers fed to Mr. Johnson's co-defendants. The officers' coercive tactics included telling Mr. Johnson he would get the death penalty if he failed to cooperate and adopt the confession as fabricated by the Defendant Officers; shouting at Mr. Johnson, swearing at Mr. Johnson, and telling him that he would never see his family again unless he confessed to the crime; telling Mr. Johnson that he would be sexually assaulted in prison unless he confessed to the crime; falsely telling Mr. Johnson that he had been identified in witness lineups and implicated in the murders by witnesses; ignoring Mr. Johnson's repeated assertions to the

Defendant Officers that he had an alibi, i.e., that he had been at this girlfriend's house at the time of the murders; promising Mr. Johnson that he would receive a more lenient sentences if he inculpated himself in the murders; and failing and refusing to terminate questioning when Mr. Johnson repeatedly requested a lawyer.

42.     After approximately ten hours of intermittent questioning by the Defendant Officers, Charles Johnson was taken to a different interrogation room. At some point while Plaintiff was in this room, Former ASA Joseph Alesia and an as-yet-unidentified Assistant State's Attorney entered the room. They asked Mr. Johnson to provide some background information, and left shortly thereafter.

43.     Before speaking to Mr. Johnson, ASA Joseph Alesia met with Defendant Valadez, in order to obtain information about the investigation and to plan for Johnson's interrogation.

44.     At around 3 a.m., Defendant Alesia returned to the room, and moved Mr. Johnson to a general office area, where he began showing Mr. Johnson photographs of individuals and asking Mr. Johnson to identify them.

45.     After each identification, Defendant Alesia asked Mr. Johnson to sign his name. Defendant Alesia then tricked and misled Mr. Johnson into signing a document, though Mr. Johnson did not understand what it was. Exhausted from the grueling interrogation, terrified, confused and utterly worn down by the officers' mistreatment, Mr. Johnson agreed to sign.

46.     It was only later that Mr. Johnson realized he had actually signed a false confession to being a shooter in the murders.

47.     At no point during the custodial interrogation or false confession did either the Defendant Officers or the Assistant State's Attorneys tell Mr. Johnson that he had the right to

have an attorney present or to remain silent. To the contrary, the Defendant Officers denied Mr.

Johnson's repeated requests to contact an attorney on the grounds of "procedure," stating that he

would be allowed to call his lawyer only after the interrogation was completed.

48. As a result of the coercive and unconstitutional tactics used by the Defendant

Officers, Mr. McCoy, Mr. Styles, and Mr. Johnson gave false confessions to crimes they did not

commit.

## PLAINTIFF'S CONVICTION

49. In November of 1998, Mr. McCoy stood trial for the murders of Khaled Ibrahim

and Yousef Ali. Mr. McCoy was tried jointly with Mr. Ezell, although before separate juries.

50. Mr. McCoy's statement was introduced against him at his trial, and was the

State's only evidence of his guilt. No physical or forensic evidence linked Mr. McCoy to the

crime, and no witnesses testified to observing him at the scene.

51. None of the Defendants who testified against Mr. McCoy at his trial or during his

motion to suppress, including, Cassidy, Davis, Coughlin, Bloore, and Green, disclosed how they

obtained false and involuntary inculpatory statements from the four young men. The same is

true for the Defendants who testified at his co-defendants' trials.

52. As a resulted of the above-described misconduct on the part of the Defendants,

Mr. McCoy was wrongfully convicted of armed robbery. The jury did not reach a verdict on the

charge of 1st Degree Murder and a mistrial was declared. After the hung jury on the murder

count, Mr. McCoy, fearing a possible life sentence without a chance for parole, entered into a

plea of guilty on the murder and was sentenced to 55 years, and 30 years on the armed robbery.

He served 21 years, 2 months, and 11 days in the Illinois Department of Corrections

## PLAINTIFF'S EXONERATION

53.     Despite his plea of guilty to avoid life in prison, throughout his prosecution and before and after his incarceration, Mr. McCoy continued to maintain his innocence and pursued all possible legal avenues to prove it.

54.     In 2009, the Circuit Court of Cook County entered an order allowing the fingerprints from the murder investigation to be reanalyzed and, where pplicable, uploaded into the Automated Fingerprint Identification Systtem (AFIS). That testing excluded Mr. Johnson, Mr. Styles, Mr. Ezell, and Mr. McCoy.  The AFIS upload also led to matching the latent crime scene fingerprints to the fingerprints of three other previously unidentified men – convicted felons with no connection to Plaintiff or his co-defendants.

55.     Mr. McCoy subsequently filed a petition under 725 ILCS 5/12-1 *et seq* based on newly-discovered evidence that he was innocent.  The Court set this matter for an evidentiary hearing.  Ultimately, the State agreed that Mr. McCoy was entitled to a new trial.  On February 15, 2017, the Cook County State's Attorney's Office dismissed all charges against Mr. McCoy.

56.     On April 21, 2017, Mr. McCoy filed a petition in the Circuit Court of Cook County for a Certificate of Innocence. The Circuit Court granted his petition on January 22, 2018.

## THE DEFENDATN OFFICERS' PATTERN OF MISCONDUCT AND THE CITY'S POLICIES AND PRACTICES FACILITATING SUCH MISCONDUCT

57.     The Defendants Officers' egregious misconduct in this case was not an isolated occurrence. It was undertaken pursuant to, and proximately caused by, the *de facto* policies and practices of the City of Chicago, acting through the CPD and its officers, which were in place at all relevant times pertaining to this case.

58.     Mr. McCoy and his co-defendants were coerced into giving false and inculpatory statements pursuant to such municipal policy. The CPD and its detectives and police officers have a long history of using physically and psychologically coercive interrogation tactics in order to elicit statements from suspects and witnesses in criminal cases, causing hundreds of false confessions and wrongful convictions in the City of Chicago.

59.     Defendants Cassidy and Boudreau are two notorious homicide detectives who, under disgraced Chicago Police Commander Jon Burge, had lengthy track records of coercing and manufacturing confessions from youth as young as 7 years old. Both Defendants as well as Defendant Valadez, conspired with other Area One detectives, including Sergeant Tuider, to coerce the false confessions of five teenagers from the Englewood neighborhood of Chicago (Terrill Swift, Harold Richardson, Michael Saunders, Vincent Thames and Jerry Fincher) in March 1995 – just six months before the events in this case occurred. Those teenagers were subsequently exonerated after each having served almost 15 years in prison.

60.     At all relevant times, the City of Chicago had a policy and practice of coercing false confessions from those in police custody and using these statements to obtain wrongful convictions. Pursuant to this municipal policy and practice, CPD officers, including the officers at Area One, used interrogation tactics identical or similar to those employed by the Defendants in this case to extract confessions. These tactics included: (a) psychological intimidation and manipulation; (b) the use of clearly unreliable or coerced informants and/or witnesses; (c) the fabrication of confessions; (d) the misleading of parents/guardians and denial of access to their children during interrogations; (e) the denial of access to counsel; (f) the concealment of exculpatory information; (g) false promises of leniency in exchange for "cooperation" in the form of a confession; (h) sleep and food deprivation; and (i) the use of other unlawful tactics to

secure the arrest, prosecution, and conviction of persons, including juveniles and teenagers, without regard to their actual guilt or innocence of the offense.

61.     Juveniles and young adults, in particular, including Mr. Ezell, Mr. Styles, Mr. Johnson, and Mr. McCoy, were the most vulnerable targets of this municipal policy. Law enforcement officers are trained to know that youth are inherently more suggestible, susceptible to manipulation, and frequently lack the ability to fully understand – let alone assert – their rights during an interrogation. As a matter of widespread custom and practice, CPD officers, including but not limited to the Defendant Officers, exploited the vulnerability and suggestibility of the youth in their custody in order to obtain false confessions and close open cases. CPD detectives systematically denied juvenile and teenage suspects access to their guardians and to counsel, fed them details of the crime, made false promises of leniency, and generally subjected these youth to immense physical and psychological pressure until they "confessed." This practice is aided, perpetuated, and enhanced by the Chicago Police Department's policy and practice of using so-called "youth officers" to assist in coercion of juveniles during interrogations as set forth more fully in this Complaint.

62.     Also pursuant to municipal policy and practice, members of the CPD, including the Defendant Officers, systematically suppressed evidence pertaining to the fabricated and coerced confessions obtained in interrogations. This exculpatory information was concealed both from trial attorneys within the Cook County State's Attorney's Office and from criminal defendants and their counsel. In furtherance of this municipal policy and practice, CPD officers, including the Defendants in this case, repeatedly committed perjury while testifying in criminal proceedings in order to conceal their use of coercive interrogation techniques. Defendants

Valadez, Cassidy, and Boudreau, in particular, committed this same misconduct in the aforementioned Englewood case in the same year Mr. McCoy and Mr. Ezell went to trial.

63.     At all relevant times, the City of Chicago also had in place *de facto* policies and practices by which CPD officers, including the Defendant Officers, were led to believe they could act with impunity, which served to facilitate and further their misconduct.  These policies and practices include: failing to identify and track officers who commit serious misconduct; failing to investigate cases in which CPD officers are implicated in obtaining coerced and false confessions, as well as unfounded charges and wrongful convictions; failing to meaningfully discipline officers accused of such unlawful conduct; and facilitating a code of silence within the CPD.  Pursuant to the City's code of silence, CPD officers were trained and required to lie or remain silent about misconduct committed on the job by their fellow officers.

64.     The City of Chicago's failure to train, supervise, and discipline its officers effectively condoned, ratified, and sanctioned the kind of misconduct that the Defendant Officers committed against Plaintiff and his co-defendants in this case.

65.     The City of Chicago and officials within the CPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

66.     All of the policies and practices described in the foregoing paragraphs were knowingly approved by City of Chicago policymakers, who were deliberately indifferent to the fact that CPD officers systematically violated the rights of the people they were sworn to protect.

**TROSHAWN MCCOY'S DAMAGES**

67. Mr. McCoy spent over 21 years in custody for a crime he did not commit. He must now attempt to make a life has attempted, over the years, to make a life for himself outside of prison without the benefit of a decade of life experience – including his late teens and early twenties—which normally equip adults for that task.

68. Mr. McCoy's emotional pain and suffering stemming from the loss of these formative years has been substantial. During his incarceration, Mr. McCoy was stripped of the basic pleasures of human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed the opportunity to begin living independently, to share holidays, births, funerals, and other life events with loved ones, to have girlfriends, to fall in love, to marry, and to pursue a career, and the fundamental freedom to live his life as an autonomous human being. Upon his release, he had to live his life as a person branded as being a violent criminal who was involved in murder, and faced all the stigma and deprivation of experiences that result from this labeling.

69. As a result, Mr. McCoy has suffered tremendous damage, including but not limited to physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct.

**COUNT I – 42 U.S.C. § 1983 VIOLATION OF DUE PROCESS**

70. Each paragraph of this Complaint is incorporated as if restated fully herein.

71. As described more fully above, all of the Defendant Officers, acting individually, jointly, and/or in conspiracy, deprived Mr. McCoy of his constitutional right to due process and to a fair trial.

72. In the manner described more fully above, the Defendant Officers fabricated false inculpatory statements from Mr. McCoy and his co-defendants, deliberately withheld and

suppressed exculpatory evidence from the prosecutors and defense counsel, and fabricated false reports and other evidence, thereby causing the wrongful prosecution of Mr. McCoy. Absent this misconduct, the criminal prosecution of Mr. McCoy could not and would not have been pursued.

73.     The Defendant Officers' misconduct directly resulted in the unjust criminal conviction and continuing wrongful incarceration of Mr. McCoy, thereby denying him his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

74.     As a result of this violation of his constitutional right to a fair trial, Mr. McCoy suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

75.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Mr. McCoy's clearly established constitutional rights.

## COUNT II – 42 U.S.C. § 1983 FIFTH AMENDMENT AND FOURTEENTH AMENDMENT

76.     Each paragraph of this Complaint is incorporate as if restated fully herein.

77.     In the manner described more fully above, the Defendants, including the Defendant Officers, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, conducted an unconstitutional interrogation of Mr. McCoy, and coerced him into making involuntary statements implicating himself in the armed robbery and murders of Khaled Ibrahim and Yousef Ali, in violation of his rights secured by the Fifth and Fourteenth Amendments.

78.     The false and involuntary inculpatory statement Defendants obtained from Mr. McCoy was used against Mr. McCoy to his detriment in his criminal case. This statement was the only reason that Mr. McCoy was prosecuted for and convicted of armed robbery in connection with the murders of Khaled Ibrahim and Yousef Ali.

79.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mr. McCoy's innocence.

80.     As a result of this violation of his constitutional rights to a fair trial, Mr. McCoy suffered injuries, including but not limited to the loss of his liberty, physical harm, severe emotional distress and anguish.

## COUNT III – 42 U.S.C. § 1983 FAILURE TO INTERVENE

81.     Each paragraph of this Complaint is incorporated as if restated fully herein.

82.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants, including the Defendant Officers stood by without intervening to prevent the violation of Mr. McCoy's constitutional rights, even though they had a reasonable opportunity to do so.

83.     As a result of the misconduct described in this count, Mr. McCoy suffered injuries, including but no limited to the loss of his liberty, physical harm, sever emotional distress and anguish.

84.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Mr. McCoy's constitutional rights.

## COUNT IV – 42 U.S.C. § 1983 SUPERVISORY LIABILITY

85.     The violation of Plaintiff's constitutional rights as described above was proximately caused by the deliberate indifference and/or recklessness of the Supervisory Defendants, including but not limited to Bonke and Tuider.

86.     Specifically, these Defendants were personally involved in Plaintiff's placement and subsequent case evaluation and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

87.     The personal involvement of these Defendant Officers, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

88.     The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

89.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. McCoy's rights.

## COUNT V – 42 U.S.C. § 1983 CONSPIRACY TO DEPRIVE PLAINTIFF OF HIS CONSTITUTIONAL RIGHTS

90.     Each paragraph of this Complaint is incorporated as if restated fully herein.

91.     After the murders of Khaled Ibrahim and Yousef Ali, the Defendant Officers, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to deprive Mr. McCoy of his constitutional rights, including his rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

92.     Additionally, before and after Mr. McCoy's conviction, the Defendant Officers further conspired to deprive him of exculpatory information to which he was lawfully entitled and which would have led to his not being charged, his acquittal, or his more timely exoneration.

93.     In furtherance of this conspiracy, each of the Defendant Officers engaged in and facilitated overt acts, including but not limited to those set forth above – fabricating evidence, withholding exculpatory evidence, and obtaining involuntary statements – and was an otherwise willful participant in joint activity.

94.     After the murders of Khaled Ibrahim and Yousef Ali, ASA Alesia, acting within the scope of his employment and under color of law, agreed with the Defendant Officers and other individuals to deprive Mr. McCoy of his constitutional right against compelled self-incrimination, as provided for by the Fifth Amendment, and described in the various paragraphs of this Complaint.

95.     As a direct and proximate result of the illicit prior agreements and action sin furtherance of the conspiracies referenced above, Mr. McCoy's rights were violated, and he suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Mr. McCoy's rights.

## COUNT VI -- 42 U.S.C. §1983 UNLAWFUL DETENTION ( FOURTH AMENDEMENT)

97.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

98.     In the manner described more fully above, the Defendant Officers caused Plaintiff to be detained and imprisoned without probably cause.

99.     The misconduct described in this Count was undertaken by the Defendant Officers under color of law and within the scope of their employment.

100.    The misconduct described in this County was objectively unreasonable and was undertaken intentionally, with malice, and/or with reckless indifference to the rights of others.

101.    As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered damages as set forth above

102.    Each paragraph of this Complaint is incorporated as if restated fully herein.

103.    The actionsof the individual Defendant Officers were undertaken pursuant to the policies and practices of the Chicago Police Department, described above and below, which included (1) failing to supervise, discipline and control Chicago Police officers and (2) maintaining a code of silence within the CPD, all of which facilitated the Defendant Officers' misconduct here.

104.    These policies and practices were ratified by policymakers for the City of Chicago with final policymaking authority.

105.    At all times material to this Complaint, Defendant City of Chicago, through its Police Department, the Office of Professional Standards (OPS), Police Superintendents, Police Board, Mayor, City Council and/or Corporation Counsel's Office, had interrelated de facto policies, practices, and customs which included, inter alia:

  a.  conducting physically, psychologically, or otherwise illegal or improperly coercive interrogations of witnesses, suspects and arrestees, in order to obtain confessions, including from juveniles and teenagers;

  b.  manufacturing, fabricating, and/or using improper suggestive tactics to obtain statements from suspects and witnesses, particularly juveniles or teenagers;

c.  the use of "youth officers" to disguise, excuse, and perpetuate the practice of conducting physically, psychologically, and otherwise illegal and improperly coercive interrogations of juveniles, including the practice of involving youth officers in such interrogations and failing to notify a parent and/or guardian of a juvenile in custody;

d.  filing false police reports, and giving false statements and testimony about these interrogations, confessions, and witness statements;

e.  suppressing evidence concerning the circumstances of these interrogations and confessions;

f.  pursuing and obtaining prosecutions and incarceration on the basis of confessions obtained during these interrogations, and otherwise covering up the true nature of the interrogations, confessions, and witness statements;

g.  failing to video and/or audio tape the interrogation or questioning of suspects, arrestees, and witnesses, particularly in the circumstances set forth in parts (a) and (b), above;

h.  failing to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control police officers, particularly those who were repeatedly accused of physically, psychologically, or otherwise illegally or improperly engaging in coercive questioning or interrogation of witnesses, suspects and arrestees; of torture and related physical abuse of suspects; of false arrests, wrongful imprisonments, malicious prosecutions, and wrongful convictions; and/or of making false reports and statements. This failure to properly train, supervise, discipline, transfer, monitor, counsel, and/or otherwise control specifically includes the "repeater" Defendants named herein, including, but not limited to, Defendants Cassidy, Alesia, Daly, Davis, Valadez, Bloore, Fine, and Coughlin, who have been accused on numerous occasions of such misconduct, including prior to the time period implicated in this case;

i.  the police code of silence, specifically in cases where officers engaged in the violations articulated in paragraphs a through e, above, whereby police officers refused to report or otherwise covered up instances of police misconduct, and/or fabricated, suppressed, and/or destroyed evidence of which they were aware, despite their obligation under the law and police regulations to so report. This code of silence also has resulted in police officers either remaining silent or giving false and misleading information, and/or testimony during official investigations and grand jury proceedings, in order to protect themselves and/or fellow officers from internal discipline, civil liability, or criminal charges, and perjuring themselves in criminal cases where they and/or their fellow officers have been accused of misconduct.

106.    The interrelated pattern and practices alleged above were or should have been

well-known within the Chicago Police Department, both before and after Mr. McCoy was

interrogated and wrongfully convicted, as well as by successive mayors, police superintendents and OPS directors, and by the Chicago City Council and the Chicago Police Board, and other policy-making, command, and supervisory City and police personnel, who participated in the cover-up and/or continuation of the policies and practices.

107.    The interrelated policies, practices, and customs set forth above, both individually and together, were maintained and implemented with deliberate indifference. They encouraged, *inter alia*, the coercing of statements from suspects, witnesses, and arrestees, particularly from juveniles and other teenagers; the construction and fabrication of confessions, admissions, statements, and other false witness evidence; the suppression and destruction of exculpatory evidence, the intimidation of witnesses, the making of false statements and reports, the giving of false testimony, and the obstruction of justice; and the pursuit and continuation of wrongful convictions and false arrests and imprisonments. The interrelated policies, practices and customs set forth above were, separately and together, a direct and proximate cause (*i.e.* a moving force) of the unconstitutional acts and perjury committed by the named Defendants and their co-conspirators, and the injuries suffered by Mr. McCoy, including his wrongful conviction and imprisonment.

108.    Additionally, the City of Chicago's failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel the Defendant Officers, including but not limited to Defendants Cassidy, Boudreau, and Valadez, was also done with deliberate indifference and likewise acted as a direct and proximate cause (*i.e.* a moving force) of the injuries to Mr. McCoy.

**Count IX – State Law Claim**
**Intentional Infliction of Emotional Distress**

109.    Each paragraph of this Complaint is incorporated as if restated fully herein.

110.     The Defendant Officers, despite knowing that probable cause did not exist to prosecute Mr. McCoy for armed robbery in connection with the murders of Khaled Ibrahim and Yousef Ali, acted individually, jointly, and/or in concert and in conspiracy, to cause Mr. McCoy to be arrested and prosecuted for that crime.  The Defendant Officers made statements to trial prosecutors with the intent of exerting influence and to institute and continue the unjust judicial proceedings.

111.     Specifically, the Defendant Officers were aware that, as described more fully above, no true or reliable evidence implicated Mr. McCoy in having involvement in these murders, all inculpatory evidence was coerced and fabricated, and forensic evidence indicated Mr. McCoy's innocence.  Furthermore, the Defendant Officers intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. McCoy, as set forth above, and failed to investigate evidence that could have led to the actual assailant.  The Defendant Officers performed the above-described acts deliberately, with malice, and with reckless disregard for Mr. McCoy's rights.

112.     On February 15, 2017, the Cook County State's Attorney's Office *nolle prossed* Mr. McCoy's case, and on January 22, 2018, the Circuit Court of Cook County awarded Mr. McCoy a Certificate of Innocence, which constitutes a termination of the criminal proceedings in his favor.

113.     As a direct and proximate result of this misconduct, Mr. McCoy sustained, and continues to sustain, injuries as set forth above, including pain and suffering.

**Count IX – State Law Claim**
**Intentional Infliction of Emotional Distress**

114.     Each paragraph of this Complaint is incorporated as if restated fully herein.

115.     The acts and conduct of the Defendants, including the Defendant Officers and ASA Joseph Alesia, as set forth above were extreme and outrageous.  The Defendants' and Mr. Alesia's actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. McCoy, as is more fully alleged above.

116.     As a direct and proximate result of the Defendants' actions, Mr. McCoy suffered and continues to suffer severe emotional distress.

**Count X – State Law Claim**
**Civil Conspiracy**

117.     Each paragraph of this Complaint is incorporated as if restated fully herein.

118.     As described more fully in the preceding paragraphs, the Defendants, including the Defendant Officers and Joseph Alesia, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

119.     In furtherance of the conspiracy, the Defendant Officers committed unlawful overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Mr. McCoy and the intentional infliction of emotional distress upon him.

120.     The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

121.     As a direct and proximate result of the Defendants' conspiracies, Mr. McCoy suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

**Count XI – State Law Claim**
**Respondent Superior**

122. Each paragraph of this Complaint is incorporated as if restated fully herein.

123. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

124. Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

**Count XII – State Law Claim**
**Indemnification**

125. Each paragraph of this Complaint is incorporated as if restated fully herein.

126. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

127. At all relevant times, the Defendant Officers were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, TROSHAWN MCCOY, respectfully requests that this Court enter judgment in his favor and against Defendants JAMES CASSIDY, KENNETH BOUDREAU, LUKE DALY, DWAYNE DAVIS, FRANCIS VALADEZ, BERNARD RYAN, JOHN BLOORE, CHERYL GREEN, J. FINE, the ADMINISTRATOR of the ESTATE of THOMAS COUHGLIN, THOMAS RICHARDSON, SERGEANT LARRY TUIDER, SERGEANT FRED BONKE, former COOK COUNTY ASSISTANT STATE'S ATTORNEY

JOSEPH ALESIA, and the CITY OF CHICAGO, as well as-yet UKNOWN CITY OF

CHICAGO EMPLOYEES, awarding compensatory damages, attorneys' fees, and costs against

each Defendant, and punitive damages against each of the individual Defendants, as well as any

other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, TROSHAWN MCCOY, hereby demands a trial by jury pursuant to Federal

Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**TROSHAWN MCCOY**

By:____/s/Jon F. Erickson_____
One of his attorneys

Jon F. Erickson
Michael D. Oppenheimer
Ronak Maisuria
Jon Neuleib
Erickson & Oppenheimer, Ltd.
223 W. Jackson Blvd., Suite 200
Chicago, Illinois 60606
(312) 327-3370