**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LASHAWN EZELL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 1049 |
| v. | ) | |
| | ) | Hon. Virginia M. Kendall |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| LAROD STYLES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 1053 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CHARLES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 1062 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| TROSHAWN MCCOY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 1068 |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs LaShawn Ezell, Larod Styles, Charles Johnson, and Troshawn McCoy each filed a nearly identical civil rights action[1] against the City of Chicago, Cook County, a number of Chicago Police Officers,[2] and former Cook County State's Attorney Joseph Alesia. Each asserts claims stemming from his wrongful conviction in 1998 for crimes related to the double murder of Khaled Ibrahim and Yousef Ali including: several claims pursuant to 42 U.S.C. § 1983 against the Defendant Officers and Defendant Alesia for allegedly coercing his false confession, fabricating evidence, and withholding and suppressing exculpatory evidence (Counts I–VI); a claim for municipal liability under *Monell*[3] against the City alleging that its policies, practices and customs and/or inadequate training, discipline and supervision caused the unconstitutional acts committed the Defendant Officers and Plaintiffs' resulting injuries (Count VII); and state law claims for malicious prosecution against the Defendant Officers (Count VIII), intentional infliction of emotional distress and civil conspiracy against the Defendants Officers and Defendant Alesia (Counts IX and X), *respondeat superior* liability against the City (Count XI) and indemnification against the City and Cook County (Count XII). (*See, e.g.,* Dkt. 1). Plaintiffs' cases were consolidated before this Court for the purpose of discovery. (Dkts. 39, 46). The City now seeks to bifurcate and stay discovery on Plaintiffs' *Monell* claims (Count VII) against it. For the

---

[1] *See Ezell v. City of Chi., et al.*, No. 18 C 1049 (N.D. Ill) (Dkt. 1); *Styles v. Cassidy, et al.*, No. 18 C 1053 (N.D. Ill.) (Dkt. 1); *Johnson v. Cassidy, et al.*, No. 18 C 1062 (N.D. Ill.) (Dkt. 1); *McCoy v. Cassidy (#2027), et al.*, No. 18 C 1068 (N.D. Ill.) (Dkt. 1).

[2] All Plaintiffs name the following Chicago Police Officers as Defendants in their Complaints: James Cassidy, Kenneth Boudreau, Luke Daly, Francis Valadez, Bernard Ryan, John Bloore, J. Fine, the Administrator of the Estate of Thomas Coughlin, Thomas Richardson, Dwayne Davis, Larry Tuider, and Fred Bonke. Plaintiffs Ezell and McCoy also name Officer Cheryl Green as a Defendant in their Complaint and Plaintiff Styles names Officer Steven Terrell as a Defendant in his.

[3] *Monell v. New York Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

following reasons, the City's Motion to Bifurcate and Stay Discovery on Plaintiffs' *Monell Claims* (Dkt. 81)[4] is granted.

## BACKGROUND

Plaintiffs cases stem from the 1995 murders of Khaled Ibrahim and Yousef Ali. The following summary of the allegations is based on the facts as alleged in Plaintiffs' Complaints.

Around 6:30 p.m. on December 4, 1995, two men visited Elegant Auto, a used car lot on Chicago's South Side owned by Ibrahim and Ali. (Dkt. 1 at ¶ 15). The men examined and touched two vehicles and then left. (*Id.*). They returned around 7:00 p.m., shot and killed Ibrahim and Ali execution-style in their office, stole two cars, and fled. (*Id.* at ¶ 16). That evening, CPD investigators lifted fingerprints and palm prints from the cars the perpetrators had touched during their initial visit to the lot. (*Id.* at ¶ 18). They also lifted fingerprints from the two stolen vehicles once they were recovered early the next morning. (*Id.* at ¶ 19). None of these prints matched any Plaintiff. (*Id.* at ¶ 20).

On December 6, the Defendant Officers arrested Plaintiff McCoy who was 17 at the time at his high school without any reason to believe he was involved in the murders and took him to the police station, isolated him, denied him counsel, harshly interrogated him and fed him information about the murders. (*Id.* at ¶¶ 21–22). Eventually, McCoy succumbed to the coercive tactics and gave a false and inculpatory statement to Defendants. (*Id.* at ¶ 23). In the false confession, McCoy stated that he and Ezell were acting as lookouts for Johnson and Styles who planned to steal a car from Elegant Auto when he and Ezell heard gunshots and saw Johnson and Styles leave the lot in two stolen cars. (*Id.* at ¶ 25).

---

[4] *See also Styles*, No. 18 C 1053 (Dkt. 52); *Johnson,* No. 18 C 1062 (Dkt. 69); *McCoy*, No. 18 C 1068 (Dkt. 25).

The Defendant Officers used McCoy's coerced confession to then arrest Styles, Johnson and Ezell without probable cause. (*Id.* at ¶ 26). After arresting Styles, who was 16 at the time, Defendants interrogated him for hours without an attorney, parent, guardian or other adult present. (*Id.* at ¶ 28). Defendants eventually brought in a youth officer who never spoke and did nothing to intervene or protect Styles. (*Id.* at ¶ 29). Styles initially denied any involvement in the murders but after several hours, gave a false and inculpatory statement. (*Id.* at ¶ 31).

Defendants arrested Johnson, who was 19 at the time, at his home. (*Id.* at ¶ 32). Upon learning he had been arrested for murder, Johnson immediately denied any involvement in the crime. (*Id.* at ¶ 35). Despite being subjected to hours of hostile and aggressive interrogation, Johnson continued to proclaim his innocence. (*Id.* at ¶ 36). Eventually after more than ten hours of questioning and denying Johnsons' requests to contact an attorney, Defendants misled Johnson into signing a false confession to being a shooter in the murders. (*Id.* at ¶¶ 42–44).

Ezell was 15 at the time he was arrested. (*Id*. at ¶ 46). The Defendant Officers took him to police headquarters, interrogated him without any attorney, parent or guardian present, and denied his requests to see his grandmother. (*Id.* at ¶ 47–51). A youth officer was present during portions of the interrogation but did nothing to intervene or to protect Ezell. (*Id.* at ¶ 50). Despite initially denying any involvement in the crimes, Ezell was eventually coerced by the Defendant Officers into signing a false confession. (*Id.* at ¶ 52).

In January 1998, Styles and Johnson were tried jointly before separate juries and each found guilty of first-degree murder and armed robbery and sentenced to life in prison without the possibility of parole. (*Styles*, Dkt. 1 at ¶¶ 49–52; *Johnson*, Dkt. at ¶¶ 48–51). In November 1998, Plaintiffs Ezell and McCoy were tried jointly before separate juries; each was found guilty of armed robbery but the jury did not reach a verdict on the first-degree murder charge against

4

McCoy. (*Ezell*, Dkt. 1 at ¶¶ 53–56; *McCoy*, Dkt. 1 at ¶¶ 49–52). Ezell was sentenced to 20 years in prison. (*Ezell*, Dkt. 1 at ¶ 56). McCoy eventually pled guilty to murder and was sentenced to 55 years for murder and 30 years for armed robbery. (*McCoy*, Dkt. 1 at ¶ 52).

In 2009, the state court ordered that the fingerprints from the murder investigation be reanalyzed and uploaded to the Automated Fingerprint Identification System. (*Ezell*, Dkt. 1 at ¶ 58). This testing excluded Plaintiffs and matched the prints to three other previously unidentified men. (*Id.*). The state court granted each Plaintiff a new trial based on newly-discovered evidence and the State's Attorney's Office dismissed all charges against them. (*Id.* at ¶ 59; *Styles*, Dkt. 1 at ¶¶ 55–57; *Johnson*, Dkt. 1 at ¶¶ 54–56; *McCoy*, Dkt. 1 at ¶ 55). Each Plaintiff filed a petition for a Certificate of Innocence and on January 22, 2018, the Court granted their petitions. (*Ezell*, Dkt. 1 at ¶ 60; *Styles*, Dkt. 1 at ¶ 58; *Johnson*, Dkt. 1 at ¶ 57; *McCoy*, Dkt. 1 at ¶ 56). Ezell served 10 years in prison and had been released in 2005. (*Ezell*, Dkt. 1 at ¶ 56). Styles, Johnson and McCoy each served approximately 21 years in prison before being released. (*Styles*, Dkt. 1 at ¶ 56; *Johnson*, Dkt. 1 at ¶ 55; *McCoy*, Dkt. 1 at ¶ 52).

On February 12, 2018, Plaintiffs filed the present actions seeking to recover damages pursuant to 42 U.S.C. § 1983 and various state-law claims for the physical harm, mental suffering, and loss of normal life caused by the Individual Defendants', the City's, and Cook County's alleged misconduct. (*See, e.g., Ezell*, Dkt. 1 at ¶ 64).

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 42(b), the Court has considerable discretion to separate claims or issues for trial if the separation would prevent prejudice to a party or promote judicial economy. *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007) (citing *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999)); Fed. R. Civ. P. 42(b); *see*

*also Treece v. Hochstetler*, 213 F.3d 360, 365 (7th Cir. 2000). "If one of these criteria is met, the district court may order bifurcation as long as doing so will not prejudice the non-moving party or violate the Seventh Amendment," which guarantees a jury trial for civil cases in federal court. *Id.* at 700 (citing *Krocka v. City of Chi.*, 203 F.3d 507, 516 (7th Cir. 2000)). Federal Rule of Civil Procedure 26(d) also permits a court to stay discovery on *Monell* claims. Fed. R. Civ. P. 26(d); *see also, e.g., Horton v. City of Chi.*, No. 13-CV-6865, 2016 WL 316878, at *2 (N.D. Ill. Jan. 26, 2016); *Saunders v. City of Chi.*, 146 F. Supp. 3d 957, 968 (N.D. Ill. 2015).

Motions for bifurcation are "now commonplace" and "there is a growing body of precedent in this district for both granting and denying bifurcation in § 1983 cases." *See, e.g., Allison v. Gallagher*, No. 10 C 6887, 2012 WL 4760863, at *1 (N.D. Ill. Oct. 5, 2012) (quoting *Elrod v. City of Chi.*, 2007 WL 3241352, at *2 (N.D. Ill. Nov.1, 2007)); *see also, e.g., Rodriguez v. City of Chi.*, No. 17 CV 7248, 2018 WL 3474538, at *2 (N.D. Ill. July 19, 2018). "Such motions and the inclination of many judges to grant them stems in large part from the recognition that, often, 'claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them.'" *See, e.g., Horton*, 2016 WL 316878, at *2 (quoting *Moore v. City of Chi.*, 2007 WL 3037121, at *9 (N.D. Ill. Oct.15, 2007)); *see also, e.g., Allison*, 2012 WL 4760863, at *1 (same). Deciding whether to bifurcate a plaintiff's *Monell* claim is left to the Court's sound discretion and "must be done on case-by-case basis, looking at the specific facts and claims presented." *See, e.g., Rodriguez*, 2018 WL 3474538, at *2; *Estate of Loury by Hudson v. City of Chi.*, No. 16 C 4452, 2017 WL 1425594, at *2 (N.D. Ill. Apr. 20, 2017); *Ojeda-Beltran v. Lucio*, No. 07 C 6667, 2008 WL 2782815, at *1 (N.D. Ill. July 16, 2008).

**DISCUSSION**

The City argues bifurcation of Plaintiffs' *Monell* claims is appropriate under Federal Rule of Civil Procedure 42 because bifurcation (1) best serves the interests of efficient litigation and judicial economy and (2) will assist in eliminating the risk of unfair prejudice and potential unnecessary expense to the parties without prejudicing Plaintiffs' ability to recover compensatory damages. (Dkt 81). In support its Motion, the City stresses that Plaintiffs' *Monell* claims are dependent first on their claims against the Defendant Officers. (*Id.* at 6–9). The City has also offered to consent to a limited entry of judgment against it should the court or a jury find the Defendant Officers committed a violation of Plaintiffs' constitutional rights, even if the Officers are protected from civil liability due to qualified immunity, without Plaintiffs having to prove any of the elements required to hold the City liable under *Monell*. (*Id.* at 8).[5] Plaintiffs argue in response that their proposed, "streamlined" approach to the discovery and presentation of their *Monell* claims will avoid the great burden the City claims will be imposed on the court and the parties if its Motion is denied and that the City's Motion ignores the prejudice to Plaintiffs and the public if Plaintiffs are deprived of the opportunity to hold the City directly liable for the systemic failures that result in false confessions and wrongful convictions. (Dkt. 91).

**I.      Interests of Litigation and Judicial Economy**

The City argues first that bifurcation best serves the interests of litigation and judicial economy because Plaintiffs' *Monell* claims are "entirely dependent" on the actions of the

---

[5] The City provided with its Motion a proposed Limited Consent of Entry of Judgment Against Defendant City of Chicago for each Plaintiff. (Dkt. 81-1, 81-2, 81-3, and 81-4). Each Limited Consent denies liability for the *Monell* claims; consents to the entry of judgment against the City for compensatory damages and reasonable attorney fees if any Defendant Officer or former or present employee disclosed by Plaintiff is found liable for a violation of Plaintiff's constitutional rights or is found to have violated Plaintiff's constitutional rights but not liable because of qualified immunity; and waives its right under *Monell* not to be held liable for damages without proof that its "policy, custom or practice" caused the alleged violation. (*See, e.g.,* Dkt. 81-1).

7

Defendant Officers. (Dkt. 81 at 6). "[I]t is established that a municipality cannot be held liable [under *Monell*] without an underlying violation of the Constitution by a municipal employee." *See Elizarri v. Sheriff of Cook Cty.*, 901 F.3d 787, 791 (7th Cir. 2018); *see also Sallenger v. City of Springfield*, Ill., 630 F.3d 499, 504 (7th Cir. 2010) (same); *Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (7th Cir. 2012) ("Here, there was no constitutional violation, therefore no municipal liability."). However, while a municipality's liability is dependent on its employees' actions, it is not necessarily dependent on its employees' liability. As the City concedes, "a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986)) (emphasis in original); (*see* Dkt. 81 at 6). To make this determination, the Court "must look to the nature of the constitutional violations, the theory of municipal liability and the defenses set forth." *Id.*

Here, each Plaintiff alleges the Defendant Officers violated his constitutional rights by coercing his false confession, fabricating evidence used against him, and/or concealing exculpatory evidence to which he was lawfully entitled. Plaintiffs' *Monell* claims relate specifically to these allegedly unconstitutional practices. (*See, e.g.,* Dkt. 1 at ¶ 108 ("The actions of the individual Defendant officers were undertaken pursuant the policies and practices of the CPD.")). Specifically, Plaintiffs allege the City maintained and implemented a list of nine policies, practice and customs that were the "direct and proximate cause (*i.e.*, a moving force) of the unconstitutional acts and perjury committed by the named Defendants" and failed to properly train, discipline, or supervise the Defendant which "likewise acted as a direct and proximate cause (*i.e.*, a moving force) of the injuries" to Plaintiffs. (*Id.* at ¶ 112). In other words, according to Plaintiffs' own *Monell* claims as alleged in their Complaints, the harm caused by these policies and/or failure

8

to train could only manifest itself through the Defendant Officers' actions. Therefore, the City cannot be found liable under *Monell* unless Plaintiffs prove that one or more of the Defendant Officers committed a constitutional violation under § 1983 as alleged in Counts I–VI. *See, e.g., Williams v. City of Chi.*, 214 F. Supp. 3d 1060, 1080–81 (N.D. Ill. 2018). Plaintiffs do not dispute this.

Additionally, the fact that the Defendant Officers have asserted qualified immunity defenses is of no event here. The question is whether the Officers committed the constitutional violation(s) underlying Plaintiffs' *Monell* claims, not whether they can be held liable for them. Furthermore, the City has guaranteed that so long as Plaintiffs succeed in showing a constitutional violation occurred, they will recover compensatory damages from the City without anything more—either as indemnification for a judgment entered against the Defendant Officers[6] or, if the Defendant Officers are found to be immune from liability, against the City pursuant to the proposed Limited Consents. (*See, e.g.,* Dkt 81-1). In either scenario, the question of whether any Defendant Officer committed a constitutional violation is dispositive; Plaintiffs' claims for compensatory damages can be resolved without ever delving into any *Monell* claim. In fact, having already recovered in their suit against the Officers, Plaintiffs would be barred from then pursuing damages for the same injuries against the City regardless. *See Swanigan v. City of Chicago*, 881 F.3d 577, 582 (7th Cir. 2018) ("Federal common law prevents § 1983 plaintiffs from recovering twice for the same injury. That means [plaintiff] cannot recover from the City for the prolonged detention

---

[6] The City has admitted that the named Defendant Officers were acting within the scope of the employment at all relevant times during their encounters with Plaintiffs, *see, e.g.,* Dkt. 66 at ¶ 10, and therefore would be required to indemnify any Defendant Officer for any judgment of liability entered against him. *See* 745 ILCS 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable.").

because he was compensated for that constitutional violation in his suit against the officers.") (citation omitted).

The City argues next that the extensive fact and expert discovery required to address Plaintiffs' broad-reaching *Monell* claims would not only be unnecessary to resolve Plaintiffs' claims for compensatory damages but also overly burdensome to the parties and to the Court. Plaintiffs contend the City "vastly overstates" the burden its *Monell* claims will impose on the parties and the Court. (Dkt. 91 at 11). But indeed, Plaintiffs' *Monell* claims are much broader than their claims against the Defendant Officers. The *Monell* claims are based on nine distinct policies, practices, and customs, each of which is in itself quite broad in scope: (1) improperly coercing confessions from witnesses, suspects and arrestees; (2) manufacturing, fabricating or using suggestive tactics to obtain statements from suspects and witnesses; (3) denying access to or failing to notify the parents and/or guardians of a juvenile in custody; (4) filing false police reports or giving false statements about coercive interrogations and false confessions; (5) suppressing evidence concerning the circumstances of coercive interrogations and false confessions; (6) prosecuting and incarcerating individuals based on false confessions obtained through coercive interrogations; (7) failing to video or audio record interrogations; (8) failing to properly train, supervise, discipline, transfer, monitor, counsel and/or otherwise control officers; and (9) maintaining a "code of silence" within CPD. (*See, e.g.,* Dkt. 1 at ¶ 110). The *Monell* claims also allege these policies were maintained and implemented not only by the Chicago Police Department but also the Office of Professional Standards, Police Superintendents, Police Board, Mayor, City Counsel and Corporation Counsel. (*See, e.g., id.*). As the City correctly recognizes, whether any of the above-listed policies constituted a "widespread practice" that resulted in similar incidents of coerced confessions and/or fabrication or suppression of evidence is immaterial to the question

of whether any individual Defendant Officer coerced a confession, fabricated evidence or suppressed evidence in one of the Plaintiff's cases. (*See* Dkt. 81 at 11). Therefore, while there will inevitably be *some* overlap, the evidence required to prove the *Monell* claims will be substantially different than that required to prove the discrete claims against the individual Defendant Officers. *See, e.g., Williams,* 315 F. Supp. 3d at 1083 (individual and *Monell* claims did not significantly overlap); *Ojeda-Beltran*, 2008 WL 2782815, at *2 (same).

Plaintiffs argue their *Monell* claims would not overwhelm this case as the City fears because they intend to "streamline" the discovery and trial presentation of these claims. (Dkt. 91 at 6). Specifically, Plaintiffs claim they intend to prove: (1) the City's widespread practice of coercing false confessions with a list of 67 cases listed on the National Registry of Exonerations in which a Chicago Police detective obtained a confession from a person who was later cleared of the charges and with testimony by one or two experts summarizing the patterns of coercion and misconduct observed after reviewing materials (including confession statements, police statements, transcripts from criminal proceedings and civil litigation and other court records) from these 67 cases; (2) that the City had notice of the problem of widespread false confessions through transcripts of City Council meetings and statements by Chicago Mayors related to the pattern of torture under Jon Burge and evidence obtained through "targeted 30(b)(6) depositions of policymakers during the relevant time period"; (3) the City's deliberate indifference to officers' coercing false confessions with "a single interrogatory and/or response to a single request for admission" that no CPD officer has ever been meaningfully investigated or disciplined after the City learned he or she had elicited a false confession from an innocent person. (*Id.* at 7–9).

As an initial matter, Plaintiffs' "streamlined" approach oversimplifies their *Monell* claims, ignoring the nine separate policies alleged, some of which are not necessarily related, at least as

11

alleged in the Complaints, only to the coercion of false confessions. (*See, e.g.,* Dkt. 1 at ¶ 109 (failing to video or audio record interrogations, failing to properly train officers, and maintaining a "code of silence")). The proposed approach also ignores the City's strategy for defending against the *Monell* claims. For example, the City disputes that it would readily admit that no CPD officer had been disciplined for coercing a false confession as Plaintiffs assume; if true, Plaintiffs would be required to take additional *Monell* discovery on the deliberate indifference element even if they currently do not intend to do so. The City also notes that even if discovery were to limited largely to requests for documents with only "targeted" depositions as Plaintiffs propose, the City would still be required to examine and produce thirty-five years' worth records concerning the 67 cases Plaintiffs have identified on the National Registry of Exonerations (13 of which, according to Defendants, are currently being litigated) as well as various CPD procedures regarding interrogations, prosecutions, training, supervision and discipline. (Dkt. 96 at 8).

Indeed, Plaintiffs provide no guarantee that *Monell* discovery could be limited in the manner proposed. Each party has a right under Federal Rule of Civil Procedure to any discovery that is relevant to a claim or defense and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). This gives the parties considerable leeway if and when *Monell* discovery is permitted; relevance and proportionality act as relatively insignificant limits here given the broad scope of Plaintiffs' *Monell* claims as alleged. Moreover, Defendants have already indicated they would at least attempt to seek broader discovery than Plaintiffs' "streamlined" approach anticipates, thereby giving rise to numerous discovery disputes. (*See, e.g.,* Dkt. 96 at 8). While it is true the Court could in its authority to exercise broad discretion over the discovery process monitor and limit *Monell* discovery as it progressed, *see* Fed. R. Civ. P. 26(b)(2)(C); *Montanez v. Simon*, 755 F.3d 547, 552 (7th Cir. 2014), doing so is not without cost and, particularly in a complicated case such

as this one that would undoubtedly require frequent judicial intervention and impose a great (and unnecessary) burden on the Court's already-limited time and resources. Surely it would be more prudent to exercise that discretion now by bifurcating the *Monell* claims altogether. *See Treece*, 213 F.3d at 365 ("[B]ifurcation avoided the needless costs and burdens of a second trial, as well as, but not limited to, the waste of the valuable time and resources of the court, and the inconveniencing of witnesses, especially in light of the fact that the City agreed to entry of judgment against itself should the jury enter a finding of liability against [the individual defendant]."). (quotation omitted).

As both Plaintiffs and the City acknowledge, the case against the Defendant Officers is already complicated, involving four Plaintiffs, more than a dozen named defendants and requiring discovery into events that occurred more than twenty years ago. *See* Dkt. 81 at 5 ("Even absent *Monell*, the parties' disclosures included over 100 witnesses to the underlying arrest and criminal prosecution, and over 100,000 pages of documents were produced."); Dkt. 91 at 4 ("The City correctly notes that discovery relating to the *individual* liability claims in these cases will necessarily be complex, resource-intensive and time consuming.") (emphasis in original). Allowing discovery—much less the presentation of evidence at trial—into Plaintiffs' broad *Monell* allegations will unquestionably complicate matters further and exponentially increase the cost to the parties and burden on the Court, not to mention require Plaintiffs to wait *years* longer than is necessary to resolve their claims for compensatory damages. Accordingly, the interest of litigation and judicial economy weighs in favor of bifurcating the *Monell* claims particularly, whereas here, the costly and time-consuming discovery and litigation of those claims are ultimately unnecessary to Plaintiffs' recovery.

## II.     Prejudice to the Parties

As already discussed, bifurcating the *Monell* claims will not prejudice Plaintiffs' ability to recover the compensatory damages they seek. Plaintiffs do not dispute this. Rather, Plaintiffs focus on the "social importance of imposing liability against the City" and argue their claims against the City also seek *non-economic* relief of awareness, systemic reform, and deterrence of future constitutional deprivations that would otherwise never occur if the City manages to avoid litigating its own culpability in Plaintiffs' injuries as it has repeatedly been allowed to do through motions to bifurcate like the one currently before the Court. (Dkt. 91 at 11–14). Plaintiffs argue, therefore, that they would be "severely prejudiced" if not permitted to pursue their *Monell* claims. (*Id.*).

Plaintiffs are correct that granting the City's Motion would effectively eliminate any opportunity for Plaintiffs to litigate the merits of their *Monell* claims. This result is not lost on the Court. Moreover, the Court agrees that § 1983 claims are intended not only to compensate victims for past wrongs but also to deter future constitutional deprivations (*see* Dkt. 91 at 12 (citing *Owen v. City of Independence*, 445 U.S. 622, 651 (1980)) and that bifurcating Plaintiffs' *Monell* claims necessarily forecloses the opportunity for deterrence that may come from those particular § 1983 claim, to the extent there is one. Plaintiffs cite several examples of judgments and settlements paid by the City to resolve claims similar to Plaintiffs' here—all without the City ever admitting its own culpability for the alleged misconduct—as proof that unless the City is held directly liable for these unconstitutional practices, they will continue. (*See* Dkt. 91 at 14, n. 8–9). But Plaintiffs fail to explain how *Monell* liability would necessarily give rise to reform; in fact, Plaintiffs explain that the City will soon adopt a number of police reforms pursuant to a Consent Decree with the Illinois Attorney General—*i.e.* reform achieved without *Monell* liability, albeit more slowly than

Plaintiffs and others similarly situated are willing to accept. Ultimately, Plaintiffs provide insufficient reason to find that a judgment entered in this case against the City based on the claims against the Defendant Officers would not serve as an adequate deterrent. *See, e.g.*, *Williams*, 315 F. Supp. 3d at 1084 ("[Plaintiff's] complaint does not limit any extraordinarily large judgment to his *Monell* claim; instead, it is entirely possible that [he] could be awarded a large judgment against the Officers, which presumably send the same message to the City and police department."); *Parker v. Banner*, 479 F.Supp.2d 827, 829 (N.D. Ill. 2007) ("If a constitutional violation occurred, then the City pays. . . . [T]hat is all *Owen* requires. The idea that the Supreme Court requires some extra incentive to deter cities from allowing their employees to violate rights is inconsistent with its policy of immunizing cities from punitive damages."). The Court in no way means to minimize Plaintiffs' interest in pursuing their *Monell* claims for reasons beyond monetary compensation but the Court must consider the issue of bifurcation with a "pragmatic mindset" and, in doing so, finds that bifurcation is appropriate in this case. *See, e.g., Allison*, 2012 WL 4760863, at *1.

## CONCLUSION

For the reasons stated above, the Court grants the City's Motion to Bifurcate and Stay Discovery on Plaintiffs' *Monell* Claims (Dkt. 81). Accordingly, the Court bifurcates Plaintiffs' *Monell* claims (Count VII) and stays all litigation, including discovery, of those claims. Additionally, the Court enters the City's proposed Limited Consent with respect to each Plaintiff (Dkt. 81-1, 81-2, 81-3, 81-4).

_____
Hon. Virginia M. Kendall
United States District Judge

Date: August 12, 2019